**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-23-00439-001-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Jesus Seferino-Nunez, | |
| Defendant. | |

The Defendant, Jesus Seferino-Nunez, is charged by Indictment with Possession with Intent to Distribute Cocaine in violation of Title 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (Doc. 3). He filed a Motion to Suppress Evidence (Doc. 22) to which the Government filed a Response, in opposition. (Doc. 26). The Defendant's Motion asserts, in essence, that the Government unlawfully seized him, so his statements were not voluntary, and conducted an unlawful search of his home. Therefore, he seeks to suppress: (1) all statements by Defendant, and (2) all evidence acquired in the search of his home. (Doc. 22 at 6–7). The Government responds that its encounter with the Defendant was consensual, that he voluntarily answered questions, both at his workplace and during an interview at the investigation agency office, and voluntarily agreed to a search of his home. (Doc. 26 at 1). It claims that if the Defendant was briefly detained, the agents had sufficient reasonable suspicion to continue his detention. (*Id.*).

The Court held a hearing on August 14, 2023, in which the Defendant and two Drug Enforcement Administration ("DEA") Special Agents ("SA") testified. The Court, having

considered the pleadings, testimony and exhibits, denies the Defendant's Motion for the following reasons.

**I.      Facts**[1]

The Defendant came to DEA Special Agent Hoss's ("SA Hoss") attention in October of 2022 through a cooperating defendant ("CD"). (UTR at 4). In SA Hoss's presence, the CD texted a telephone number and asked for "five." SA Hoss understood that to mean five kilograms of drugs. (Doc. 26 at 2). The CD received a response that the respondent had "five" but it would be gone by the weekend. (UTR at 4). SA Hoss obtained a subpoena for the telephone number and subsequently learned that the cell phone belonged to the Defendant, Jose Seferino-Nunez. (*Id*.) The DEA also identified the Defendant's home address and vehicle. (*Id*. at 5). Thereafter, the DEA acquired a tracking warrant for the Defendant's telephone and began monitoring his cell phone activities between January 3, 2023 and February 1, 2023. (*Id*. at 6–7).

**A.      The DEA Agents Approach the Defendant at the Warehouse**

In the early morning on February 1, 2023, SA Hoss sat outside of the Defendant's home and followed him and another person to the Defendant's workplace. (Doc. 38 at 11–12). While following the Defendant, SA Hoss called for other DEA Agents to join him, and two did. (*Id*. at 16). All three agents were wearing street clothes with "Police" emblazoned bulletproof vests and holstered weapons on their hips. (*Id*. at 16–17).

SA Hoss testified that on arriving at the Defendant's workplace, he observed the Defendant and other employees walking in and around the open-bay area of a warehouse. (*Id*. at 15). The agents walked up to the Defendant and asked him who he was. (Doc. 38 at 18). He stated "Jesus." SA Hoss asked for his identification, and the Defendant stated he had none. (*Id*.) SA Hoss pointed to what appeared to be a wallet in his pocket and the Defendant produced an Arizona driver's license with 'Jesus Seferino-Nunez' on it. (*Id*. at 19–20).

---

[1] The facts are as plead by the parties in their respective pleadings and the testimony referred to in the transcript of proceedings of the August 14, 2023, hearing. ("UTR").

1       On approaching the Defendant, SA Hoss identified himself and the other agents as
2  "police" and asked him if they could step to the side so that others in the area would not
3  hear them. (*Id*. at 20). They then walked to a side parking lot area and stood between two
4  cars. (*Id*. at 21). SA Hoss testified that no one grabbed the Defendant, nor did anyone
5  force him to the parking lot area. (Doc. 38 at 21). DEA Special Agent Nicholas Schiller
6  ("SA Schiller") also testified at the hearing that, while at the warehouse, no one grabbed
7  the Defendant, nor did he or anyone brandish a firearm. (*Id*. at 112). However, SA Schiller
8  stated that he may have placed his hand on his weapon as a training habit. (*Id*. at 122). SA
9  Hoss then asked the Defendant if he had any weapons on his person, and he stated "No."
10 (*Id*. at 21). SA Hoss told the Defendant that he was going to pat him down to make sure.
11 (*Id*.). During the pat down, SA Hoss felt a phone and "grabbed the phone and put it on the
12 vehicle" in front of the Defendant. (Doc. 38 at 21). SA Hoss testified that he did so
13 because he believed that was the phone they had been tracking and he did not want it to be
14 destroyed. (*Id*.) SA Hoss then dialed the cell number of the phone that they were tracking,
15 and the Defendant's cell phone rang. (*Id*. at 22).

16      SA Hoss testified that none of the agents had the Defendant's cell phone PIN to
17 enter and open the cell phone. (*Id*. at 26). SA Hoss asked the Defendant "why the DEA
18 had his phone number" and about the text message that he had five kilos of cocaine. (*Id*. at
19 22). The Defendant told SA Hoss that he did not know anything about drugs. (Doc. 38 at
20 23). SA Hoss told the Defendant that they wanted his cooperation and that they were more
21 interested in who supplied his cocaine. (*Id*.) SA Hoss testified that he told the Defendant
22 that "he had the ability to walk away from this clean, but that he would have to tell them
23 the entire truth and help us find who he was receiving the cocaine from." (*Id*.) SA Hoss
24 stated that "he could go to jail" if he was untruthful. (*Id*.) In response, the Defendant
25 started telling them "a little bit about his involvement." (*Id*.)

26      SA Schiller testified that he did not recall approaching the Defendant at the
27 warehouse open bay door, rather, he waited and did not approach the Defendant until he
28 was in the side parking lot with SA Hoss and Task Force Officer Bob McCabe. (Doc. 38

1  at 122). He testified that he did so to not further intimidate the Defendant. (*Id.*) SA
2  Schiller testified that the Defendant never said that he did not wish to speak with them, nor
3  did he indicate that he wanted to leave. (*Id*. at 112). The Defendant did say that he was
4  afraid that he was going to get into trouble with his boss, so the agents decided that they
5  would explain that they needed the Defendant's assistance to investigate a hit-and-run, to
6  which the Defendant agreed. (*Id*. at 123). The Defendant testified that though he felt
7  scared and surrounded, he never sought out help or assistance from anyone at his
8  workplace. (Doc. 38 at 75, 93–94).

Regarding the warehouse encounter, the Defendant's testimony differs from that of SA Hoss and Schiller, and his Motion. He testified that three DEA agents approached him at the open bay door and that all three DEA agents had their hands on their weapons as they walked directly toward him and surrounded him. (*Id*. at 75). He stated that when they asked for him by name, he tried to walk into the warehouse, and they ran up to him and SA Hoss grabbed him by the arm. (*Id*.) He stated that as soon as they approached him, they took his phone immediately and started going through it. (*Id*. at 105–106). He also testified that the agents spoke with him for about three to four minutes, but people were watching them, so they moved toward the parking area. (*Id* at 76). In his Motion, the Defendant asserted that the agents backed him into a corner and questioned him for 40 minutes. (Doc. 22 at 2).

### B.     The Search of Defendant's House

Upon the Defendant telling the agents a little bit of his involvement, SA Hoss asked him if he had any drugs at his home. (Doc. 38 at 22). The Defendant said "yes," that he had personal amounts of cocaine. (*Id*.) SA Hoss asked how much that was and the Defendant said he had three-fourths of a kilogram of cocaine at his home. (*Id*. at 21). At that point, SA Hoss asked the Defendant if he would be willing to go to his house to get the cocaine, to which he responded "yes." (*Id*.) SA Hoss testified that during this conversation, no agent placed their hands on the Defendant, nor did they threaten him or have their weapons drawn. (*Id*.).

The Defendant rode in the front seat of SA Hoss's car to his house. The Defendant was not handcuffed. (Doc. 38 at 27; 92). SA Hoss testified that he asked Defendant if he would go to his house with him and that part of the reason for this request was that he did not want to inconvenience the coworker whom Defendant drove to work with that morning. (*Id*. at 60). On the drive, SA Hoss reassured the Defendant that if he cooperated "he would walk away unscathed" and the Defendant offered that there was money and firearms at his house. (*Id*.). SA Hoss testified that at no time on the drive did the Defendant refuse to cooperate or to go to his home. (*Id*. at 28–29).

When they arrived at the Defendant's home, SA Hoss and the Defendant were joined by four more DEA agents. (*Id*. at 65). The Defendant unlocked his front door and DEA agents entered the home with their firearms drawn to conduct a protective sweep while the Defendant and SA Hoss stayed in the living room. (Doc. 38 at 94). SA Hoss testified that he had the Defendant sign a consent to search form, then Defendant began pointing out where items of interest in the house were. (*Id*. at 31; 94). The Defendant also showed the agents where to find the cocaine, in a backpack in the garage. (*Id*. at 35). The Defendant testified that the over 400 grams of cocaine was for personal use as he was going through depression. (*Id*. at 95).

While in the garage, SA Hoss noted that the Defendant had two ATVs inside of his garage and a Polaris dune buggy on his property. (*Id*. at 35, 42). SA Hoss then started asking the Defendant about his finances. (Doc. 38 at 37). Deciding that the Defendant did not have the financial ability to have purchased these vehicles, the DEA seized the Polaris dune buggy as well as his Dodge Ram truck. (*Id*. at 38, 42). The Defendant gave SA Hoss consent to search the Dodge Ram, but not to take it. (*Id*. at 38). SA Hoss testified that there were two cell phones found inside of the Dodge Ram as well and that he "told" Defendant that he was going to search these phones. (*Id*. at 38–40). Defendant did not object to this, but he did tell SA Hoss that the phones belonged to his children. (*Id*. at 40).

The Defendant stated that before the agents left his home, he gave them the code to unlock his cell phone. (*Id*. at 103). The Defendant testified that he felt threatened the

whole time, but he had no cell phone and nowhere to run. (*Id*. at 96).  The Defendant testified that he signed the consent to search form out of fear and that he "didn't know what [he] was signing." (*Id*. at 97).  The Defendant also stated that the consent form was his only receipt that the DEA had taken his dune buggy, Dodge Ram, money, and other property. (Doc. 38 at 103).

The Defendant's factual assertions in his Motion differ somewhat from his testimony.  The Defendant stated in his Motion that agents "snatched the phone from his hands and began to scroll through the phone." (Doc. 22, at 2).  The Defendant's Motion states that Defendant did not want the Agents to destroy his house, so he gave them what they were looking for. (*Id*.)  The Defendant also stated in his Motion that the agents took his cameras and $40,000 in cash but only logged a forfeiture of $30,000. (*Id*.)

### C. The Interview at the DEA Office

At approximately 4:00 p.m., four hours after the home search ended, the Defendant and his wife voluntarily drove to the DEA office. (Doc. 38 at 98; Doc. 22 at 2).  He testified that he only went to the DEA office to retrieve his cell phone. (Doc. 38 at 98). The agents read the Defendant his *Miranda* rights and told him that he was free to leave at any time.  (*Id*. at 44–45, 102). They told the Defendant that the interview would be recorded. (*Id*.).  The Defendant then sat through a thirty-nine-minute interview. (*Id*. at 101). The interview was terminated when the Defendant told the agents that he felt stressed and that he wanted to get some rest and to go home. (*Id*.) The Defendant testified that he "felt like if [he] didn't answer questions or cooperate with them at that moment, [he] was not going to leave that place." (*Id*. at 102).   Once he got his cell phone, the Defendant went home. (*Id*.)

## II. Law Regarding the Defendant's Motions to Suppress

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. CONST. amend. IV.  A defendant may seek to exclude evidence obtained in violation of his Fourth Amendment right against an illegal search or seizure. *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).  The exclusionary rule applies to statements or

physical evidence obtained during an illegal search and seizure as well as to "statements or physical evidence subsequently obtained in part as a result of the search – if they 'bear a sufficiently close relationship to the underlying illegality.'" *United States v Ladum*, 141 F.3d 1328, 1336-37 (9th Cir. 1998) (internal citations omitted).

A warrantless search may occur when an individual gives consent that is "voluntary, unequivocal, and specific." *United States v. Taylor*, 60 F.4th 1233, 1243 (9th Cir. 2023) (internal citations omitted). An encounter will not violate the Fourth Amendment unless it loses its consensual nature. *Florida v. Bostwick*, 591 U.S. 429, 433 (1991). "[A]n initially consensual encounter . . . can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion)). A seizure occurs "when a law enforcement officer, through coercion, 'physical force[,] or a show of authority, in some way restricts the liberty of a person.'" *United States v. Washington*, 387 F.3d 1060, 1069 (9th Cir. 2004) (internal citations omitted). A person's liberty is restrained when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id* (citing *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). However, a seizure based on reasonable suspicion is not per se unconstitutional if it is sufficiently brief and minimally intrusive. *See id* (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985) (examining, under *Terry*, "whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion")).

The voluntariness of consent to search or seize is analyzed based on "the totality of the circumstances." *Taylor*, 60 F.4th at 1243 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Ninth Circuit precedent has focused the voluntary analysis on five non-dispositive and non-exclusive factors: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4)

whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *Id* (internal citations omitted). "No one factor is determinative in the equation [therefore] [i]t is not necessary to check off all five factors, but many of this Circuits' decisions upholding consent as voluntary are supported by at least several of the factors." *United States v. Patayan Soriano*, 361 F.3d 494, 502–03 (9th Cir. 2004) ("[T]hese factors are guideposts to consider in assessing the voluntariness of consent, not a checklist of requirements to be satisfied." (internal citations and quotation marks omitted)). Further, "[b]ecause each factual situation surrounding consent to a search is unique, [the Court] may also take into account any other factors that [it] deem[s] relevant." *Liberal v. Estrada*, 632 F.3d 1064, 1082 (9th Cir. 2011).

As for the Fifth Amendment, the "privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner." *Miranda v. Arizona*, 384 U.S. 436, 476 (1966). *Miranda* applies only to "custodial interrogation[s]." *Bradford v. Davis*, 923 F.3d 599, 617 (9th Cir. 2019). A person is in custody for *Miranda* purposes where "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc) (citations omitted). For example, law enforcement questioning alone does not constitute a seizure. *Id.* (citing *Florida v. Rogers*, 460 U.S. 491 (1983)). Moreover, asking an individual a "moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicion" is permissible. *Washington*, 387 F.3d at 1067 (discussing the expansion of a *Terry*-stop). No violation occurs when law enforcement merely approaches a person at a public place and asks him if he is willing to answer questions, or by asking him questions or by subsequently offering in evidence his voluntary answers to those questions. *Bostwick*, 591 U.S. at 433.

In determining whether suspects are "in custody" for *Miranda* purposes, the Supreme Court has considered whether they voluntarily approached or accompanied law enforcement officers with an understanding that questioning would ensue. *See California v. Beheler*, 463 U.S. 1121, 1125 (1982) (per curiam) (holding that defendant was not in

custody when he agreed to accompany police to the station to answer questions and was allowed to leave immediately afterward); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (holding that defendant was not in custody when he came to the station voluntarily and left "without hindrance" after 30 minutes of questioning).

The Court must "examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position" to determine whether the suspect was "in custody." *Crawford*, 372 F.3d at 1053. Among the relevant factors are: (1) the language used to summon the person; (2) the extent to which the person is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention, and (5) the degree of pressure applied to detain the individual. *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987). "Other factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators;" the *Crawford* factors are "simply ones that recur frequently." *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002).

**III.   Discussion**

The Defendant argues that his initial consensual encounter was transformed into an unlawful seizure and that he was subjected to a custodial interrogation, in violation of his Miranda and Fourth Amendment rights. (Doc. 22, at 3, 5). The Government argues that the entire encounter with the Defendant was consensual and voluntary, but in the alternative, that the DEA had reasonable suspicion to briefly detain and question Defendant. (Doc. 26, at 16). The Court will address the Defendant's *Miranda* and Fourth Amendment arguments separately.

    **A.     The Defendant Was Not in Custody and His Statements Were Voluntary**

Examining the totality of the circumstances, the Court finds that the Defendant was not in custody. *See Crawford*, 372 F.3d at 1053. Regarding the first factor, the manner in which SA Hoss summoned the Defendant was not particularly unusual or concerning. As he is permitted to do, SA Hoss approached the Defendant, asked for his name and

identification, and the Defendant answered "Jesus." *See Bostick*, 501 U.S. at 434 (stating that an encounter does not lose its consensual nature "simply because a police officer approaches an individual and asks a few questions."). Though he stated he had no identification, he eventually gave SA Hoss his Arizona driver's license confirming his identify. *See Washington*, 387 F.3d at 1060 (asking an individual a "moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicion" is permissible).

As for the second factor, the extent to which the person is confronted with evidence of guilt, this factor warrants serious consideration. Upon positively linking the Defendant to the cellular phone that they were tracking, SA Hoss asked the Defendant if he knew why the DEA had his cell phone number and confronted him with evidence of drug dealing. (Doc. 38 at 22–23). However, SA Hoss also explained that they were seeking his truthful cooperation otherwise he could be arrested. (*Id*. at 23). While this factor does weigh in favor of a finding that the Defendant was in custody, it does not weigh very heavily in that direction as the agents did not contradict the Defendant's statements, they merely asked him about evidence they had and informed him that they were interested in his supplier. *See United States v. Norris*, 428 F.3d 907, 913 (9th Cir. 2005) (Courts in this Circuit have found that a defendant was not in custody when police "did not attempt to challenge [the defendant's] statements with other 'known facts suggesting his guilt, [rather], they merely asked [him] about the allegations.").

The third and fourth factors, the physical surroundings of the interrogation and the duration of the detention, both tip towards the encounter being consensual and voluntary. The DEA agents' initial interaction with the Defendant was relatively brief and occurred in an open and public place during the day. *See United States v. Brown*, 996 F.3d 998, 1005 (9th Cir. 2021) (relying on the fact that the encounter occurred during the day and in a public place to find that the defendant was not in custody). Indeed, the agents, *and* the Defendant, were concerned about the people moving around the warehouse, so they moved to the parking lot area. Though the Defendant testified that "[he] felt that [he] was just

surrounded by them," SA Hoss repeatedly informed him that he was not under arrest and that they were more interested in finding out the source of his cocaine supply. (Doc. 38 at 75). When the Defendant expressed concern about his work ("I told them that I had to work, I had a lot of work") (*Id*.) SA Schilller said that they could speak with his employer and tell him that they were investigating a hit and run and that they needed his help, to which the Defendant agreed. (Doc. 38 at 123). Thus, the physical surroundings of the interrogation bolster a finding that the Defendant was not in custody.

As for the fourth factor, the Court finds that the duration of the detention was not excessive as the Defendant consented or volunteered to keep interacting with the agents. *United States v. Bassignani* is instructive here. In *Bassignani*, the suspect's interview lasted two-and-a-half hours. 575 F.3d 879, 881 (9th Cir. 2009). The Ninth Circuit described that length as "at the high end" of a duration for detention and concluded it weighed in favor of finding that the suspect was in custody. *Id*. at 886. However, the Court "accord[ed] less weight to this factor" because it was not a "marathon session designed to force a confession." *Id*. Here, the Defendant testified that he was with the agents only about a minute or two before they moved to the side parking lot. (Doc. 38 at 76). The initial interview between the agents and the Defendant lasted approximately 15 to 20 minutes. (Doc. 26, at 3). After the initial interview, the Defendant and SA Hoss were in Hoss's car for about fifteen to twenty minutes. (Doc. 38 at 28). The Defendant sat in the front of SA Hoss's car and was not placed in handcuffs. (*Id*. at 92). Once they arrived at the Defendant's home, the agents and Defendant were in the house for approximately thirty-minutes to an hour as well. (*Id*. at 37). In sum, the Defendant was detained for approximately an hour and ten minutes to an hour and forty minutes, however, the duration of the detention was broken up, to some degree. Therefore, similar to *Bassignani,* the Court accords less weight to this factor because the Defendants encounter with SA Hoss and other agents was not a "marathon session." Thus, the Court finds that the duration of detention was not excessive and cuts against a finding of custody.

Finally, factor five, the degree of pressure applied to detain the individual, weighs

against a finding of custody as well. In his Motion, the Defendant states that **five agents** in vests "with large letters saying POLICE" approached him at his place of business and several "had their hands on their weapons.". (Doc. 22 at 2) (emphasis added). Yet, he testified that **three agents** approached him, consistent with the testifying agents. (Doc. 38 74-75) (emphasis added). He testified that all three agents had their hands on their weapons when they walked toward him. (*Id*. at 75). SA Hoss testified that they had firearms, but that their firearms were holstered and that at no time did they brandish their weapons.[2] (*Id*. at 17). SA Schiller testified he had his hand on his weapon but that he did not brandish it. (*Id*. at 121). A reasonable person approached by individuals with "Police" emblazoned vest would have some level of concern. But that concern appears short-lived given the Defendant's apparent willingness to speak with the agents, as well as his predominant concern about his work responsibilities and possible trouble with his supervisor. *See United States v. Drayton*, 536 U.S. 194, 205 (2002) (stating that "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of [an] encounter absent active brandishing of the weapon).

Thus, upon examining the totality of the circumstances from the perspective of a reasonable person in the Defendant's position, the Court concludes that Defendant was not "in custody" for *Miranda* purposes. *See Crawford*, 372 F.3d at 1053.

Even assuming, *arguendo*, that the DEA's questioning of the Defendant at his workplace was a seizure, the DEA agents had reasonable suspicion to stop and detain him for questioning. *See Washington*, 387 F.3d at 1069 (stating that a seizure based on reasonable suspicion is not per se unconstitutional if it is sufficiently brief and minimally intrusive). The Defendant was identified by a DEA cooperating defendant as a drug source. (Doc. 38 at 8–9). Months prior, the CD, in the presence of the DEA, texted the Defendant's number, ordered cocaine and was told he had "five" available. (*Id*.) SA Hoss conducted an investigation to confirm that the telephone number the CD called to order cocaine

---

[2] SA Shiller testified that he did have a hand on his holstered weapon, however he never removed the pistol from its holster. (Doc. 38 at 121).

- 12 -

belonged to the Defendant. (*Id*.) Once the Defendant's identity and the cellular telephone number was confirmed, the DEA obtained a federal search warrant to monitor his calls for suspected drug activity. (*Id*. at 10). They did so for approximately one-month. (*Id*. at 11). Based on the reasonable suspicion that the Defendant was involved in selling cocaine, the DEA then contacted him at his workplace to further their investigation into his cocaine supply source.

Notably, SA Hoss emphasized to the Defendant throughout his conversation that he was not under arrest and that they were more interested in obtaining his cooperation. (Doc. 38 at 58). The Court notes that, while he drove the Defendant to his home, SA Hoss reassured the Defendant that if he cooperated "he would walk away unscathed." (*Id*. at 56). This statement could be seen as semi-coercive; however, it is far from a promise to the Defendant that would have been sufficiently compelling to overbear his will as he never promised any tangible benefit in exchange for Defendant's cooperation (e.g., no prosecution, reduced charges, or a recommendation of a lenient sentence). *See United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) ("An interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect."). The surrounding circumstances and indefiniteness of SA Hoss's attempt to reassure the Defendant fall short of a promise that, by itself, would have been sufficiently compelling to overbear the Defendant's will. *See id* (stating that the "promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances" to render the defendant's statement involuntary). Thus, the Defendant's admission that he had cocaine at his home was sufficient to bolster the reasonable suspicion that Defendant was involved in illegal drug activity and allow the agents some leeway in their initial interaction with the Defendant.[3]

---

[3] The Court also finds parts of the Defendant's testimony lack credibility. *See Earp v. Davis*, 881 F.3d 1135, 1145 (9th Cir. 2018) (citing *Anderson v. City of Bessemer* City, 470 U.S. 564, 575 (1985) ("Sitting as fact-finder, the trial court judge is tasked with weighing

- 13 -

The Court further finds that the Defendant's statements during his recorded interview did not violate his *Miranda* rights either. The Defendant voluntarily drove to the DEA office. (Doc. 38 at 98). The agents read the Defendant his *Miranda* rights, told him that he was free to leave at any time and that he was not being arrested or detained, and asked him if he wanted to talk. (*Id*. at 44–45, 102). The Defendant agreed and sat through a thirty-nine-minute recorded interview. (*Id*. at 103). The interview was terminated when the Defendant told the agents that he felt stressed and that he wanted to get some rest and to go home. (*Id.*) From this, the Court concludes that the Defendant's statements to the agents were voluntary. *See Beheler*, 463 U.S. at 1124–1125 (questioning initiated by the police of a suspect who voluntarily accompanies law enforcement officers to the station house is not custodial); *Mathiason*, 429 U.S. at 495 (holding that defendant was not in custody when he came to the station voluntarily and left "without hindrance" after 30 minutes of questioning).

### B. The Defendant's Consent Was Not Coerced

The Defendant also contends that his consent was granted under duress. (Doc. 26, at 5). The Court is not persuaded. Utilizing the factors set out in *Taylor*, 60 F.4th at 1243,

---

and making factual findings as to the credibility of witnesses.")). In his Motion, he stated that he was not free to decline their requests, his responses were not voluntary and his consent to search his home was involuntary given the circumstances. (*See* Doc. 22 at 3–5). The testimony reflected otherwise. For example, Defendant testified that when he was approached in the open area of the warehouse, he tried to turn to go into the warehouse whereupon "they kind of run up to me and approach me quicker and [Officer Lucas] grab me by the arm so I won't go in the warehouse." (Doc. 38 at 75). Neither SA Hoss nor Schiller corroborated that testimony. (*Id.* at 76). In his Motion, Defendant states that the agents "snatched the phone from his hands and began to scroll through the phone." (Doc. 22 at 2). Yet SA Hoss testified that he did not have the capacity to unlock the Defendant's phone. (Doc. 38 at 26). Further, his Motion states that the agents backed him into a corner and questioned him for 40 minutes. (Doc. 22 at 2). In contrast, Defendant himself testified that they walked him over to a fence where they placed him between two parked cars and began to question him. (Doc. 38 at 78). Thus, in weighing the credibility of the witnesses, as a trial judge must when ruling on a motion to suppress, the Court finds Defendant's Motion and testimony lack credibility due to their contradictions. *See Earp*, 881 F.3d at 1145.

and looking at the totality of the circumstances as they relate to the Defendant's consent, the Court concludes that the entire encounter was consensual.

The Court found above that the Defendant was not in custody. As well, the agents did not have their guns drawn, *Miranda* warnings were not initially given, but Defendant voluntarily spoke with the agents, and the agents did not tell Defendant that they could get a warrant; however, it does not seem, from the record, that Defendant was told he could refuse consent either. *Id*. Consent is supported by several of these factors, but the factor that is determinative to the Court is that, throughout the entire encounter, the Defendant was "cooperative." (Doc. 38 at 61). *See Bassignani*, 575 F.3d at 884 (concluding that a two-and-a-half-hour interview between the defendant and police was consensual where "the interview was conducted in an open, friendly tone," the defendant "participated actively," and it was clear that the defendant was "behaving strategically" by talking with the police to see what evidence they had on him).

Here, during their initial encounter, SA Hoss told the Defendant that they wanted his cooperation and that they were more interested in who supplied his cocaine. (Doc. 38 at 23). The Defendant never sought out help or assistance from anyone at his workplace. (*Id*. at 75, 89). The Defendant was also forthcoming about having cocaine at his home and was willing to take the agents there to seize the cocaine. (*Id*. at 23–25). The Defendant even rode in the front seat of SA Hoss's car to his house and was not handcuffed. (*Id*. at 27; 92).

Upon entering his home, The Defendant unlocked the door for the agents and waited while they swept the house. (Doc. 38 at 80). The Defendant signed a written consent form and pointed out where the cocaine was, but also pointed out where he kept his pistol and where he kept his money: $30,000. (*See id*. at 31). Before the agents left, the Defendant also gave the agents the code to unlock his phone. (*Id*. at 106). Further, when the Defendant went to the DEA office, he was read his *Miranda* rights and still sat through a thirty-nine-minute recorded interview. (*Id*. at 100). The Defendant was told at the outset that he was free to leave at any time but sat through the interview until he felt stressed out

and wanted to go home. (Doc. 38 101). SA Hoss testified that, at no time during the search of his home, did the Defendant tell any of the agents that they wanted him to stop. (*Id*. at 36). All of this, in the aggregate, is evidence the Court finds persuasive to show that The Defendant gave voluntary, unequivocal, and specific consent to the agents. *Taylor*, 60 F.4th at 1243 ("A suspect may 'unequivocal[ly] and specific[ally]' consent by giving express permission, or consent can be inferred from conduct, such as a head nod."). Thus, the initial consensual encounter never transformed into a seizure.

### C. The DEA Unlawfully Seized the Defendant's Vehicles

Lastly, the Court finds that the DEA violated the Defendant's right to be free from an unreasonable seizure and exceeded the scope of the consent that they were granted by the Defendant by taking his vehicles. "It is a violation of a suspect's Fourth Amendment rights for a consensual search to exceed the scope of the consent given." *United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006). A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). When an officer is given consent to search, the officer must still have probable cause that an item is evidence of a crime or contraband to seize it. *See Soldal v. Cook Cnty.*, 506 U.S. 56, 68 (1992).

*United States v. Lopez-Cruz* is instructive here. 730 F.3d 803 (9th Cir. 2013). There, border patrol agents pulled the defendant over and the defendant gave the agents consent to search two cell phones that were in plain view. *Id*. at 805–06. While searching the phones, the agents took the phones behind the defendant's car and one of the phones rang. *Id*. at 806. Without asking for permission to answer, the agent answered the phone and received information that led to the defendant being arrested. *Id*. Prior to trial, the district court granted the defendant's motion to suppress, holding that "a reasonable person would not 'believe that a consent to look at or search a cell phone would include consent to answer incoming calls.'" *Id*.

The government appealed the district court's decision to the Ninth Circuit, which held that "the agent's answering of the phone exceeded the scope of the consent that he

obtained and, thus, violated [the defendant's] Fourth Amendment right. As a general matter, consent to search a cell phone is insufficient to allow an agent to answer that phone; rather, *specific consent* to answer is necessary." *Lopez-Cruz,* 730 F.3d at 811. The Circuit Court reasoned that the agent "did not have a [search] warrant. Accordingly, he did not have authority to search for evidence that might have fallen within the scope of a warrant that he did not have." *Id.* at 810. To support this reasoning, the Court stated that "a search pursuant to consent is limited by the extent of the consent given for the search by the individual." *Id.*

In this case, the DEA agent's seizure of the Defendant's vehicles was unreasonable because it was not readily apparent that they were evidence of a crime or contraband, therefore, the seizure does not meet the probable cause standard. *See Soldal*, 506 U.S. at 68. Further, the agents exceeded the scope of consent given to them by the Defendant. Defendant gave them consent to search his home. (Doc. 38 at 29). SA Hoss asked the Defendant if he could also search the Dodge Ram truck and found two cell phones inside of the vehicle. (*Id.* at 38). SA Hoss failed, however, to ask the Defendant if he could seize the vehicles—the agents simply took them after their discussion of his finances. (*Id.* at 37–38). A reasonable person would not believe that consent to search their home would also include consent to seize their vehicles based on the officer's subjective belief that the Defendant was living beyond his means. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Moreover, the Court finds that the agents did not have probable cause to believe that the vehicles were contraband or evidence of a crime, like with the cocaine, money, and firearms that the Defendant pointed out, therefore, they should have received the Defendant's specific consent to seize his vehicles. *See Lopez-Cruz,* 730 F.3d at 811. Thus, the DEA agents unlawfully seized the Defendant's vehicles and violated his right to be free from unlawful seizure as well as the scope of the Defendant's consent.

**IV. Conclusion**

Accordingly, the Court finds that the Defendant's Motion is not well taken. However, for the reasons set forth above, the Court also finds that the DEA unlawfully

- 17 -

seized the Defendant's vehicles and violated his right to be free from unlawful seizure under the Fourth Amendment.

Thus, **IT IS ORDERED** that the Defendant's Motion to Suppress Evidence (Doc. 22) is **DENIED**.

**IT IS FURTHER ORDERED** that the DEA will return Defendant's dune buggy and his Dodge Ram truck.

Dated this 29th day of September, 2023.

Honorable Diane J. Humetewa
United States District Judge